**IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIRCUIT CIVIL DIVISION**

DEBRYNNA GARRETT, ALEXANDER C. ROBERTS,
TIMOTHY DIXON, JR., KONICA RITCHIE,
JESSICA YOUNG, LAMOND RICHARDSON,
ANGELA CANSINO, JOHNNY OLDEN,
KATRINA EVANS, DANIEL WALKER,
TODD ALEXANDER, ELTON GOULD,
LAMEKA DOTSON, NICHOLAS COLLINS,
REMEAL EUBANKS, TANIA PAUL,
GABRIELLE MURRELL, COURTNEY NELSON,
individually and on behalf of all others similarly situated,

        Plaintiffs,

v.                                       Case No.:  20-CA-001146

FACEBOOK, INC., and COGNIZANT
TECHNOLOGY SOLUTIONS U.S. CORPORATION,

        Defendants.

_____/

## <u>AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiffs DEBRYNNA GARRETT, ALEXANDER C. ROBERTS, TIMOTHY DIXON,

JR., KONICA RITCHIE, JESSICA YOUNG, LAMOND RICHARDSON, ANGELA CANSINO,

JOHNNY OLDEN, KATRINA EVANS, DANIEL WALKER, TODD ALEXANDER, ELTON

GOULD, LAMEKA DOTSON, NICHOLAS COLLINS, REMEAL EUBANKS, TANIA PAUL,

GABRIELLE MURRELL and COURTNEY NELSON ("Plaintiffs") hereby sue the Defendants,

FACEBOOK, INC. ("Facebook"), and COGNIZANT TECHNOLOGY SOLUTIONS U.S.

CORPORATION ("Cognizant") (collectively, "Defendants") to protect themselves and all others

similarly situated from the dangers of psychological trauma resulting from Defendants' failure to

provide a safe workplace for the thousands of "content moderators" who are entrusted to provide

the safest environment possible for Facebook users.

## BACKGROUND

1.     Every day, Facebook users post millions of videos, images, and livestreamed broadcasts of child sexual abuse, rape, torture, bestiality, beheadings, suicide, racist violence and murder. To maintain a sanitized platform, maximize its already vast profits, and cultivate its public image, Facebook relies on people like Plaintiffs – known as "content moderators" – to view those posts and remove any that violate the corporation's terms of use.

2.     From their cubicles during the overnight shift in Cognizant's Tampa and Phoenix offices, Plaintiffs witnessed thousands of acts of extreme and graphic violence. As another Facebook content moderator recently told the Guardian, "You'd go into work …, turn on your computer and watch someone have their head cut off. Every day, every minute, that's what you see. Heads being cut off."

3.     As a result of constant and unmitigated exposure to highly toxic and extremely disturbing images through Facebook's content review systems, Plaintiffs and other class members developed and suffer from significant psychological trauma and/or post-traumatic stress disorder ("PTSD").

4.     In an effort to cultivate its image, Facebook helped draft workplace safety standards to protect content moderators like Plaintiffs and the proposed class from workplace trauma and associated adverse consequences, which include pre-hiring psychological screening; providing moderators with robust and mandatory counseling and mental health support; altering the resolution, audio, size, and color of trauma-inducing images; and training moderators to recognize the physical and psychological symptoms of PTSD.

5.     Other recommended safety standards include: having content moderators work in pairs or teams rather than alone; improving working conditions by not focusing solely on

efficiency and productivity; and providing additional breaks or "wellness time" during periods of extraordinary stress.   In addition, Cognizant employees requested to change their queues. For example, several content moderators asked the company to change which queues they were assigned, whereby Workforce Management could periodically place a moderator in less graphic queues, such as regulated goods.  Defendants failed to implement any of these safety standards.

6.      But Defendants ignore the very workplace safety standards they helped create. Instead, the multibillion-dollar corporations affirmatively require their content moderators to work under conditions known to cause and exacerbate psychological trauma.

7.      Facebook contracts with companies like Cognizant to serve as its agent responsible for finding, hiring and employing the moderators, and then laying them off when the contract expires, thereby attempting to absolve Defendants of accountability for the mental health of (offering no psychological support to) their workers after they are laid off.  In fact, Cognizant has shut down its Tampa and Phoenix offices in February 2020, laying off its workforce and leaving content moderators, including Plaintiffs, with no means of obtaining requisite ongoing medical monitoring, screening, diagnosis, or adequate treatment after suffering psychological trauma during their employment.

8.      By requiring their content moderators to work in dangerous conditions that cause debilitating physical and psychological harm and then laying them off when the contract expires in order to absolve themselves of accountability for their mental health issues, Defendants violate Florida and Arizona law.

9.      Without this Court's intervention, Defendants will continue to breach the duties they owe to the content moderators who review content on Facebook's platforms.

10.      Content moderators are essentially the first responders of the internet, performing

a critical function on a platform with billions of users. Many times, moderators are the first to see emergency situations and report them to Facebook to report to local authorities. Plaintiffs were specifically referred to as "first responders," and Facebook compiles statistics about how moderators assist law enforcement. Plaintiffs and the other content moderators, at a minimum, deserve the same protections as other first responders, which includes workers' compensation/health coverage for the PTSD caused by the working conditions.

11.     On behalf of themselves and all others similarly situated, Plaintiffs bring this action (1) to ensure that Defendants cease to engage in these unlawful and unsafe workplace practices and instead provide content moderators with safe tools, systems, and mandatory ongoing mental health support, (2) to establish a medical monitoring fund for testing and providing mental health treatment to the thousands of current and former content moderators affected by Defendants' unlawful practices, and (3) to provide monetary compensation to the thousands of current and former content moderators for the lost wages and medical and mental health expenses incurred as a result of the Defendants' unlawful practices.

## JURISDICTION AND VENUE

12.     This is an action for damages in excess of $30,000.00, exclusive of interest, costs, and equitable relief.

13.     Venue is proper in this Court because the unlawful conduct giving rise to the claims herein occurred within this judicial district, and at least one Defendant is located in this judicial district.

14.     This Court has personal jurisdiction over Cognizant because the corporation operates, conducts, engages in, and carries on a business venture in this state and has an office in this judicial circuit, at 7725 Woodland Center Blvd., Tampa, FL 33614, and regularly conducts

substantial business there, committed a tortious act within Florida, and engages in substantial and not isolated activity within Florida.

15.    This Court has personal jurisdiction over Facebook because the corporation operates, conducts, engages in, and carries on a business venture in this state and has an office in this state, located at 701 Brickell Ave., Miami, Florida 33131, and regularly conducts substantial business there and throughout the state, committed a tortious act within Florida, and engages in substantial and not isolated activity within Florida.

## PARTIES

16.    Plaintiffs Garrett, Roberts, Dixon, Ritchie, Young, Richardson, Cansino, Olden, Evans, Walker, Alexander, Dotson, Collins, Eubanks, Paul, Murrell and Nelson are residents of Hillsborough County, Florida. Plaintiff Gould is a resident of Pasco County, Florida. Plaintiff Roberts is a citizen of Arizona.

17.    Defendant Facebook provides "products that enable people to connect and share with friends and family through mobile devices, personal computers, and other surface" or "to share their opinions, ideas, photos and videos, and other activities with audiences ranging from their closest friends to the public at large." Facebook is a publicly traded corporation incorporated under the laws of Delaware, with its headquarters located at 1601 Willow Road, Menlo Park, California, 94025.

18.    Defendant Cognizant is a professional services vendor that employed approximately 800 workers at its Facebook content moderation site in Tampa. Cognizant is a publicly traded corporation incorporated under the laws of Delaware, with its headquarters located at 211 Quality Circle, College Station, TX 77845.

## FACTUAL ALLEGATIONS

A.  **Content moderators watch and remove some of the most depraved images on the internet to protect users of Facebook's products from trauma-inducing content.**

19.     Content moderation is the practice of removing online material that violates the terms of use for social networking sites or applications like Facebook.com and Instagram.

20.     Instead of scrutinizing content before it is published to its users, Facebook primarily relies on users to report inappropriate content. Facebook receives more than one million user reports of potentially objectionable content on its social media sites and applications every day. Human moderators review the reported content – sometimes thousands of videos and images every shift – and remove those that violate Facebook's terms of use.

21.     After content is flagged, Facebook's algorithms direct it to a content moderator, who then reviews it using a platform developed by Facebook.

22.     Facebook asks content moderators to review more than 10 million potentially rule-breaking posts per week via its review platforms. Facebook seeks to ensure all user-reported content is reviewed within 24 hours of a report and with an overall error rate of less than one percent.

23.     Facebook has developed and continually revises hundreds of rules that content moderators use to determine whether flagged content – i.e., posts, comments, messages, images, videos, advertisements, etc. – violates Facebook's policies.

24.     Facebook has also developed expectations for the amount of time a content moderator should need to review different types of flagged content.

25.     According to Monika Bickert, head of global policy management at Facebook, Facebook conducts weekly audits of every content moderator's work to ensure that its content rules are being followed consistently.

26.    In August 2015, Facebook rolled out Facebook Live, a feature that allows users to broadcast live video streams on their Facebook pages. Mark Zuckerberg, Facebook's chief executive officer, considers Facebook Live to be instrumental to the corporation's growth. Mr. Zuckerberg has been a prolific user of the feature, periodically "going live" on his own Facebook page to answer questions from users.

27.    But Facebook Live also provides a platform for users to livestream murder, beheadings, torture, and even their own suicides, including the following:

- In late April 2017, a father killed his 11-month-old daughter and livestreamed it before hanging himself. Six days later, Naika Venant, a 14-year-old who lived in a foster home, tied a scarf to a shower's glass doorframe and hung herself. She streamed the whole suicide in real time on Facebook Live. Then in early May, a Georgia teenager took pills and placed a bag over her head in a suicide attempt. She livestreamed the attempt on Facebook and survived only because viewers watching the event unfold called police, allowing them to arrive before she died.

- On March 15, 2019, the horrific mass shooting in Christchurch, New Zealand, which killed 50 people at two mosques, was livestreamed on Facebook as the shooter pulled up to a mosque in Christchurch, New Zealand, grabbed guns out of his vehicle and stormed inside, opening fire on worshipers. By the time Facebook removed the 17-minute video, it had been viewed roughly 4,000 times, the company said.

28.    Facebook understands the dangers associated with a person watching this kind of imagery.

29.    In the context of protecting users from this kind of content, Mr. Zuckerberg announced on May 3, 2017:

"Over the last few weeks, we've seen people hurting themselves and others on Facebook—either live or in video posted later. Over the next year, we'll be adding 3,000 people to our community operations team around the world – on top of the 4,500 we have today – to review the millions of reports we get every week, and improve the process for doing it quickly.

These reviewers will also help us get better at removing things we don't allow on Facebook like hate speech and child exploitation. And we'll keep working with local community groups and law enforcement who are in the best position to help someone if they need it – either because they're about to harm themselves, or because they're in danger from someone else."

30.     According to Sheryl Sandberg, Facebook's chief operating officer, "Keeping people safe is our top priority. We won't stop until we get it right."

31.     Today, approximately 15,000 content moderators around the world review content via Facebook's review platforms.

32.     Most of these 15,000 content moderators, like Plaintiffs and the proposed class here, are employed by third-party vendors of Facebook and are not Facebook employees.

33.     For many reasons, including short-term contracts and the trauma associated with the work, most content moderators – like Plaintiffs – remain in the position for short periods of time.  When the contractors' contracts expire, the content moderators are laid off and abandoned by Defendants, with no access to adequate or ongoing mental health services or psychological support.

**B.      Repeated exposure to graphic imagery can cause devastating psychological trauma, including PTSD.**

34.     It is well known that exposure to images of graphic violence can cause debilitating injuries, including PTSD.

35.     In a study conducted by the National Crime Squad in the United Kingdom, 76 percent of law enforcement officers surveyed reported feeling emotional distress in response to exposure to child abuse on the internet. The same study, which was co-sponsored by the United

Kingdom's Association of Chief Police Officers, recommended that law enforcement agencies implement employee support programs to help officers manage the traumatic effects of exposure to child pornography.

36.     In a study of 600 employees of the Department of Justice's Internet Crimes Against Children task force, the U.S. Marshals Service found that a quarter of the cybercrime investigators surveyed displayed symptoms related to psychological trauma, including from secondary traumatic stress.

37.     Another study of cybercrime investigators from 2010 found that "greater exposure to disturbing media was related to higher levels of . . . secondary traumatic stress" and that "substantial percentages" of investigators exposed to disturbing media "reported poor psychological well-being."

38.     The Eyewitness Media Hub has also studied the effects of viewing videos of graphic violence, including suicide bombing, and found that "40 percent of survey respondents said that viewing distressing eyewitness media has had a negative impact on their personal lives."

39.     Whereas viewing or hearing about another person's traumatic event used to be considered "secondary traumatic stress," the current Diagnostic and Statistical Manual of Mental Disorders (American Psychiatric Association, 5th ed. 2013) ("DSM-5") recognizes that secondary or indirect exposure to trauma, such as repeated or extreme exposure to aversive details of trauma through work-related media, meets the first diagnostic criterion for PTSD.

40.     It is well established that stressful work conditions, such as especially demanding job requirements or a lack of social support, reduce resilience in the face of trauma exposure and increase the risk of developing debilitating psychological symptoms.

41.     Depending on many factors, individuals who have experienced psychological

trauma may develop a range of subtle to significant physical and psychological symptoms, including extreme fatigue, disassociation, difficulty sleeping, excessive weight gain, anxiety, nausea, and other digestive issues.

42.     Trauma exposure and PTSD are also associated with increased risk of chronic health problems including cardiovascular problems, strokes, pain syndromes, diabetes, epilepsy, and dementia.

43.     There is growing evidence that early identification and treatment of PTSD is important from a physical health perspective, as a number of meta-analyses have shown increased risk of cardiovascular, metabolic, and musculoskeletal disorders among patients with long-term PTSD.

44.     Psychological trauma and/or PTSD are also often associated with the onset or worsening of substance use disorders. Epidemiologic studies indicate that one-third to one-half of individuals with PTSD also have a substance use disorder. Compared to individuals without PTSD, those with PTSD have been shown to be more than twice as likely to meet the diagnostic criteria for alcohol abuse or dependence; individuals with PTSD are also three to four times more likely to meet the diagnostic criteria for drug abuse or dependence.

45.     PTSD symptoms may manifest soon after the traumatic experiences, or they may manifest later in life, sometimes months or years after trauma exposure.

46.     An individual's risk of developing PTSD or associated symptoms may be reduced through prevention measures, which include primary, secondary, or tertiary interventions. Primary interventions are designed to increase resilience and lower the risk of future PTSD among the general population. Secondary interventions are designed to lower the risk of PTSD among individuals who have been exposed to trauma, even if they are not yet showing symptoms of

traumatic stress. Finally, tertiary interventions are designed to prevent the worsening of symptoms and improve functioning in individuals who are already displaying symptoms of traumatic stress, or have been diagnosed with PTSD.

47.     Individuals who develop PTSD or other mental health conditions following traumatic exposure require not only preventative measures but also treatment. Unlike prevention, treatment measures are aimed at symptom resolution and recovery from the condition.

48.     Preliminary screening is necessary to determine which types of prevention or treatment measures are most appropriate for an individual.

**C.      Facebook helped craft industry standards for minimizing harm to content moderators but failed to implement the very standards it helped create.**

49.     In 2006, Facebook helped create the Technology Coalition, a collaboration of internet companies aiming "to develop technology solutions to disrupt the ability to use the Internet to exploit children or distribute child pornography."

50.     Facebook was a member of the Technology Coalition at all times relevant to the allegations herein.

51.     In January 2015, the Technology Coalition published an "Employee Resilience Guidebook for Handling Child Sex Abuse Images" (the "Guidebook").

52.     According to the Guidebook, the technology industry "must support those employees who are the front line of this battle."

53.     The Guidebook recommends that internet companies implement a robust, formal "resilience" program to support content moderators' well-being and mitigate the effects of exposure to trauma-inducing imagery.

54.     With respect to hiring content moderators, the Guidebook recommends:

        a.      In an informational interview, "[u]se industry terms like 'child sexual abuse

imagery' and 'online child sexual exploitation' to describe subject matter."

b.    In an informational interview, "[e]ncourage candidate to go to websites [like the National Center for Missing and Exploited Children] to learn about the problem."

c.    In follow-up interviews, "[d]iscuss candidate's previous experience/ knowledge with this type of content."

d.    In follow-up interviews, "[d]iscuss candidate's current level of comfort after learning more about the subject."

e.    In follow-up interviews, "[a]llow candidate to talk with employees who handle content about their experience, coping methods, etc."

f.    In follow-up interviews, "[b]e sure to discuss any voluntary and/or mandatory counseling programs that will be provided if candidate is hired."

55.    With respect to safety on the job, the Guidebook recommends:

a.    Limiting the amount of time an employee is exposed to child sexual abuse imagery;

b.    Teaching moderators how to assess their own reaction to the images;

c.    Performing a controlled content exposure during the first week of employment with a seasoned team member and providing follow up counseling sessions to the new employee;

d.    Providing mandatory group and individual counseling sessions administered by a professional with specialized training in trauma intervention; and

e.    Permitting moderators to "opt-out" from viewing child sexual abuse

imagery.

56.     The Technology Coalition also recommends the following practices for minimizing exposure to graphic content:

    a.     Limiting time spent viewing disturbing media to "no more than four consecutive hours;"

    b.     "Encouraging switching to other projects, which will allow professionals to get relief from viewing images and comeback recharged and refreshed;"

    c.     Using "industry-shared hashes to more easily detect and report [content] and in turn, limit employee exposure to these images. Hash technology allows for identification of exactly the same image previously seen and identified as objectionable;"

    d.     Prohibiting moderators from viewing child pornography one hour before the individuals leave work; and

    e.     Permitting moderators to take time off as a response to trauma.

57.     According to the Technology Coalition, if a company contracts with a third-party vendor to perform duties that may bring vendor employees in contact with graphic content, the company should clearly outline procedures to limit unnecessary exposure and should perform an initial audit of the independent contractor's wellness procedures for its employees.

58.     The National Center for Missing and Exploited Children ("NCMEC") also promulgates guidelines for protecting content moderators from psychological trauma. For instance, NCMEC recommends changing the color or resolution of the image, superimposing a grid over the image, changing the direction of the image, blurring portions of the image, reducing the size of the image, and muting audio.

59.    Based on these industry standards, some internet companies take steps to minimize harm to content moderators. However, Defendants do not take any of the mitigating set forth above.   Cognizant did not even conduct any psychological evaluations on new employees, including Plaintiffs, to determine if they were a good fit for the job.  Although there are counselors on staff, they do not provide any real counseling services.  In fact, management was told to monitor how much time employees spent with counselors in order to discourage use of counseling services.

60.    Content moderators review thousands of traumatic images each day through Facebook's review platforms without the benefit of these known safeguards and with little training on how to handle the resulting distress.

61.    In addition, Facebook sets overarching standards relating to the timeframe for and accuracy of review.

62.    Plaintiffs and other content moderators at the Tampa and Phoenix Cognizant facilities faced relentless pressure from their bosses to better enforce Facebook's community standards, which receive near-daily updates that leave its contractor workforce in a perpetual state of uncertainty.   The Tampa site, which has been accurately referred to in the press as a "sweatshop," has routinely failed to meet the 98 percent "accuracy" target set by Facebook. With a score hovering around 92, it has been Facebook's worst-performing site in North America.

63.    In mid-2019, a "Wellness Summit" was held, where Facebook displayed the productivity statistics for its content moderator contractors. Cognizant was on the bottom of the list. After this Summit, Cognizant issued directives to begin writing up employees for lack of production and taking too much "wellness" time.

64.    Following the Wellness Summit, employees, including Plaintiffs, were being pushed hard. Employees were expected to review 300 pieces of content per day.  Employees were

being written up for lack of production and taking too much "wellness" time (e.g. time to "decompress" during a shift).  These write ups were based on a directive from Cognizant, which originally came from Facebook

65.      Facebook understands that its standards impose intense pressure and stress on content moderators, and that such stress contributes to and exacerbates content moderators' risk of developing psychological trauma.

66.      As one moderator described the job:

"[The moderator] in the queue (production line) receives the tickets (reports) randomly. Texts, pictures, videos keep on flowing. There is no possibility to know beforehand what will pop up on the screen. The content is very diverse. No time is left for a mental transition. It is entirely impossible to prepare oneself psychologically. One never knows what s/he will run into. It takes sometimes a few seconds to understand what a post is about. The agent is in a continual situation of stress. The speed reduces the complex analytical process to a succession of automatisms. The moderator reacts. An endless repetition. It becomes difficult to disconnect at the end of the eight-hour shift."

67.      Facebook also demands that its content moderation vendors, including Cognizant, require their employees to sign sweeping Non-Disclosure Agreements ("NDAs").  Facebook further requires its vendors to provide Facebook-developed training to all content moderators to instruct the moderators not to speak about the content or workplace conditions to anyone outside of their review team. By prohibiting content moderators from discussing their work or seeking outside social support, Facebook impedes the development of resiliency and increases the risk that moderators will develop psychological trauma.

68.      The results of an in-depth investigation into the dangerous working conditions at Cognizant's Tampa facility and some of the psychological harm suffered by the content moderators employed there was published in The Verge in June 2019. For further background information, please visit: https://www.theverge.com/2019/6/19/18681845/facebook-moderator-

interviews-video-trauma-ptsd-cognizant-tampa  and  https://www.cnn.com/videos/business/2019/06/23/former-facebook-moderator-blows-the-whistle.cnn.

**E.      Plaintiffs Garrett's individual allegations.**

69.      From approximately July 2018 until the present, Plaintiff Garrett worked as a Process Executive (a/k/a Facebook Content Moderator) at Cognizant's offices at 7725 Woodland Center Blvd., Tampa, FL 33614.

70.      During this period, Plaintiff Garrett was employed by Cognizant.

71.      At all times relevant to this complaint, Cognizant was an independent contractor of Facebook.

72.      Cognizant directly oversaw all human resources matters concerning Ms. Garrett.

73.      Ms. Garrett has never been employed by Facebook in any capacity and never received any wages or employee benefits package (e.g., wellness benefits, paid time off, parental financial assistance) from Facebook.

74.      During her employment as a content moderator, Ms. Garrett was exposed to thousands of images, videos, and livestreamed broadcasts of graphic violence, including beheadings, mutilations, terrorist killings and torture, rapes and murders.

75.      On the night of March 9, 2018, Mr. Roberts's coworker, Keith Utley, had a heart attack and died at his desk during Mr. Roberts's shift. Management came in and instructed everyone that they could not speak about it with anyone.  Cognizant never disclosed what Mr. Utley was watching when he died, nor did it taking any apparent mitigating steps to ensure this does not happen again to other content moderators.

76.      Ms. Garrett and other content moderators in Tampa and Phoenix receive two 15-minute breaks and a 30-minute lunch each day, along with nine minutes per day of "wellness" time

that they purportedly can use when they feel overwhelmed by the emotional toll of the job.

77.     On March 15, 2019, two consecutive terrorist shooting attacks occurred at mosques in Christchurch, New Zealand, killing 51 people and injuring 49. The gunman, a white supremacist, live-streamed the first 17 minutes of this attack on Facebook Live.  Cognizant employees, including Ms. Garrett, were forced to watch these horrific images over and over again due to its viral nature.  Defendants Facebook and Cognizant did not provide support after this event and failed to have trauma counselors on site.

78.     As a result of the extreme working conditions and unrelenting pressure, in Fall 2018, Ms. Garrett was diagnosed with PTSD.  As a result of these impairments, Ms. Garrett went out on a leave of absence in or about September 2019.

**E.     Plaintiffs Roberts' individual allegations.**

79.     From approximately November 2017 until January 19, 2020, Plaintiff Roberts worked as a Facebook content moderator at Cognizant's offices at 2512 West Dunlap Ave., Phoenix, AZ 85021.

80.     During this period, Plaintiff Roberts was employed by Defendant Cognizant.

81.     At all times relevant to this complaint, Cognizant was an independent contractor of Facebook.

82.     Cognizant directly oversaw all human resources matters concerning Mr. Roberts.

83.     Mr. Roberts has never been employed by Facebook in any capacity and never received any wages or employee benefits package (e.g., wellness benefits, paid time off, parental financial assistance) from Facebook.

84.     During his employment as a content moderator, Mr. Roberts was regularly exposed to thousands of images, videos, and livestreamed broadcasts of graphic violence, including the

17

most vile and disturbing things humans are capable of.

85.     As a result of the extreme working conditions and unrelenting pressure, Mr. Roberts suffers PTSD-related symptoms and was told he needs to be treated for PTSD.  He now has constant nightmares about content, specifically about brutal murders.

86.     Many times, Mr. Roberts communicated the personal distress he was suffering to "therapy professionals" on site who were purportedly there to provide support. However, these "therapy professionals" did not provide support.  Mr. Roberts observed that their presence was just to keep up appearances to make it seem that support was available due to troubling content.

87.     The nine minutes per day of "wellness" time that content moderators purportedly can use when they feel overwhelmed by the emotional toll of the job is woefully insufficient.  If an employee exceeds the nine minutes, he or she is penalized for an "occurrence," which can serve as a basis for termination of employment.

**F.     Additional Similarly Situated Plaintiffs**

88.     Plaintiffs Dixon, Ritchie, Young, Richardson, Cansino, Olden, Evans, Walker, Alexander, Dotson, Collins, Eubanks, Paul, Gould, Murrell and Nelson were all employed by Cognizant as Facebook content moderators and were exposed to thousands of unmitigated images, videos, and livestreamed broadcasts of graphic violence, including beheadings, mutilations, terrorist killings and torture, rapes and murders and, as a result suffer from PTSD and/or related mental health impairments.  Thus, all Plaintiffs are in a substantially identical factual situation and the questions of law raised herein are applicable to each Plaintiff.

89.     Plaintiffs have been required to retain the undersigned counsel to represent them in this action and are obligated to pay them a reasonable fee for their services.

90.     Plaintiffs demand a jury trial on all claims.

## CLASS ACTION ALLEGATIONS

91.     Plaintiffs bring this class action individually and on behalf of all Florida and Arizona citizens who performed content moderation work for Facebook within the last three years as an employee of Cognizant.

92.     The class is so numerous that joinder of all members is impracticable. Plaintiffs do not know the exact size of the class since that information is within the control of Defendants.

93.     However, upon information and belief, Plaintiffs allege that the number of class members is in the thousands. Membership in the class is readily ascertainable from Defendants' records, e.g., Cognizant's employment records and/or Facebook's records relating to its contract with Cognizant or to registered users of its content review platforms.

94.     Plaintiffs' claims are typical of the claims of the class, as all members of the class are similarly affected by Defendants' wrongful conduct.

95.     There are numerous questions of law or fact common to the class, and those issues predominate over any question affecting only individual class members. The common legal and factual issues include the following:

a.      Whether Defendants committed the violations of the law alleged herein;

b.      Whether Defendants participated in and perpetrated the tortious conduct complained of herein;

c.      Whether Plaintiffs and the class are entitled to medical monitoring;

d.      Whether Plaintiffs and the class are entitled to monetary compensation for the lost wages and medical and mental health expenses incurred as a result of the Defendants' unlawful practices.

e.      Whether Defendants should be ordered to implement and comply with industry

guidelines for safety in content moderation.

96.     The claims asserted by Plaintiffs are typical of the claims of the class, in that the representative Plaintiffs, like all class members, were exposed to highly toxic, unsafe, and injurious content while providing content moderation services for Facebook. Each member of the proposed class has been similarly injured by Defendants' misconduct.

97.     Plaintiffs will fairly and adequately protect the interests of the class. Plaintiffs have retained attorneys experienced in class actions and complex litigation. Plaintiffs intend to vigorously prosecute this litigation. Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other class members.

98.   Plaintiffs and the class members have all suffered and will continue to suffer harm resulting from Defendants' wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many members of the proposed class who could not individually afford to litigate a claim such as is asserted in this complaint. This class action likely presents no difficulties in management that would preclude maintenance as a class action.

## FIRST CAUSE OF ACTION
### INTENTIONAL TORT – COGNIZANT
**(Deliberate Concealment Or Misrepresentation Of Known Danger)**

99.     Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 98 as though fully set forth herein.

100.    Defendant Cognizant had knowledge of the known danger to Plaintiffs and the class

by knowingly exposing them to highly toxic, unsafe, and injurious content while providing content moderation services for Facebook.

101.    Defendant Cognizant had knowledge of the known danger to Plaintiffs and the class based upon prior similar injuries to other workers as well as explicit warnings by industry groups specifically identifying the danger or exposing employees to highly toxic, unsafe, and injurious content while providing content moderation services that was virtually certain to cause injury to Plaintiffs and the class.

102.    Based upon these warnings, Cognizant's actions in exposing employees to highly toxic, unsafe, and injurious content while providing content moderation services was virtually certain to result in injury to Plaintiffs and the class if proper precautions were not taken.  Cognizant, despite being aware of the existence of such precautions, intentionally refused to implement such precautions.

103.    Plaintiffs and the class were not aware of the danger caused by providing content moderation services for Facebook because it was not apparent and was not disclosed to them by Cognizant.  Indeed, Cognizant prevented content moderators from discussing the dangers with new employees because they were required to sign broad NDAs.

104.    Cognizant deliberately concealed and misrepresented these dangers to Plaintiffs and the class, thereby preventing them from exercising informed judgment as to whether to perform the work.  Instead, Cognizant advertised the job as a prestigious career in high technology that simply required them to become knowledgeable about "leading social media products and community standards," to "assist our community and help resolve inquiries empathetically, accurately and on time," and to "make well balanced decisions and personally driven to be an effective advocate for our community."

105.    Cognizant's actions in knowingly exposing Plaintiffs and the class to highly toxic, unsafe, and injurious content while providing content moderation services for Facebook caused the injury of the Plaintiffs and the class, including PTSD and other psychological disorders, physical injuries including stroke and epilepsy, and other injuries, including lost pay, lost future earning capacity, emotional distress and loss of enjoyment of life.

106.    As a result of Cognizant's tortious conduct, Plaintiffs and the class are at an increased risk of developing serious mental health injuries, including, but not limited to, PTSD, as well as associated physical injuries.

107.    To remedy that injury, Plaintiffs and the class need medical monitoring that provides specialized screening, assessment, and treatment not generally given to the public at large.

108.    The medical monitoring regime includes, but is not limited to, baseline screening, assessments, and diagnostic examinations that will assist in diagnosing the adverse health effects associated with exposure to trauma. This screening and assessment will also inform which behavioral and/or pharmaceutical interventions are best suited to prevent or mitigate various adverse consequences of post-traumatic stress and other conditions associated with exposure to graphic imagery.

109.    In particular, the medical monitoring regime includes (a) "secondary" preventative interventions, designed to reduce the risk of later onset of PTSD among class members who are not yet displaying symptoms of PTSD; (b) "tertiary" interventions, designed to reduce the worsening of symptoms among those who are experiencing symptoms associated with post-traumatic stress or have a diagnosis of PTSD; and (c) evidence-based treatments to facilitate recovery from mental health conditions.

110.     Monitoring, assessing, and providing preventative interventions and/or treatment to Plaintiffs and the class will significantly reduce the risk of long-term injury, disease, and economic loss that Plaintiffs and the class suffer as a result of Cognizant's unlawful conduct.

111.  Plaintiffs seek medical monitoring to facilitate the screening, diagnosis, and adequate treatment of Plaintiffs and the class for psychological trauma, including to prevent or mitigate conditions such as PTSD.

## SECOND CAUSE OF ACTION
### NEGLIGENCE - FACEBOOK
### (Negligent Exercise of Retained Control)

112.     Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 98 as though fully set forth herein.

113.     The hirer of an independent contractor is liable for its own negligence to an employee of the contractor insofar as a hirer's exercise of retained control affirmatively contributed to the employee's injuries.

114.     If an entity hires an independent contractor to complete work but retains control over any part of the work, the hiring entity has a duty to the independent contractor's employees or subcontractors to exercise that control with reasonable care.

115.     If the hiring entity negligently exercises its retained control in a manner that affirmatively contributes to the injuries of the contractor's employees or subcontractors, the hiring entity is liable for those injuries.

116.     At all times relevant to the allegations herein, Plaintiffs and class members were employees of Cognizant, an independent contractor that Facebook hired to provide content moderation services.

117.     Facebook exercised retained control over certain aspects of the work performed by

23

Plaintiffs and the class, including:

    a.    Requiring content moderators to use Facebook-developed review platforms that presented unmitigated traumatic content to content moderators according to Facebook-developed algorithms;

    b.    Requiring that content moderators – through Cognizant—sign NDAs and undergo Facebook-developed confidentiality trainings that prohibit them from discussing their work outside their review teams; and

    c.    Setting expectations as to the overall timeframe for and accuracy of content review, calculating the amount of time it should take a content moderator to review different types of posts, and deciding the overall number of man hours required to meet the overarching timeframe and accuracy expectations.

118.    Based on its exercise of retained control, Facebook has had at all relevant times a duty to exercise reasonable care with regard to the safety of Plaintiffs and the class.

119.    Facebook negligently exercised its retained control in a manner that affirmatively contributed to the injuries of Plaintiffs and the class, including by exacerbating Plaintiffs' and class members' risks of developing PTSD or other health issues. For example:

    a.    Facebook failed to provide adequate technological safeguards to protect content moderators from risks associated with exposure to traumatic content via Facebook's review platforms and algorithms;

    b.    Facebook's NDAs and confidentiality trainings diminished content moderators' social support networks and resilience by prohibiting content moderators from speaking about the content they reviewed or other related workplace conditions to anyone outside of their review teams; and

c.      By setting demanding standards for review, both in terms of quantity and quality expectations, Facebook imposed stressful work conditions that serve to further reduce content moderators' resilience to trauma.

120.    Facebook was aware of the psychological trauma that could be caused by viewing video, images, and/or livestreamed broadcasts of child abuse, rape, torture, bestiality, beheadings, suicide, murder, and other forms of extreme violence through its review platforms.

121.    Facebook was also aware or should have been aware that its review platforms could be made safer if proper precautions were followed; that requiring content moderators not to discuss their work or workplace conditions reduced their ability to deal with traumatic content; and that Facebook's overall quality and quantity standards had the effect of imposing intense workplace stress and, accordingly, increasing content moderators' risk of injury from psychological trauma.

122.    Facebook breached its duty to Plaintiffs and the class by failing to provide the necessary and adequate technological safeguards, safety and instructional materials, warnings, social support, and other means to reduce and/or minimize the physical and psychiatric risks associated with exposure to graphic imagery through Facebook's review platform.

123.    Facebook continues to breach its duty to class members by failing to exercise its retained control with reasonable care; that breach continues to elevate class members' risks of injury from psychological trauma.

124.    As a result of Facebook's tortious conduct, Plaintiffs and the class are at an increased risk of developing serious mental health injuries, including, but not limited to, PTSD, and associated physical injuries.

125.    To remedy that injury, Plaintiffs and the class need medical monitoring that provides specialized screening, assessment, and treatment not generally given to the public at

large.

126.    The medical monitoring regime includes, but is not limited to, baseline screening, assessments, and diagnostic examinations that will assist in diagnosing the adverse health effects associated with exposure to trauma. This screening and assessment will also inform which behavioral and/or pharmaceutical interventions are best suited to prevent or mitigate various adverse consequences of post-traumatic stress and other conditions associated with exposure to graphic imagery.

127.    In particular, the medical monitoring regime includes (a) "secondary" preventative interventions, designed to reduce the risk of later onset of PTSD among class members who are not yet displaying symptoms of PTSD; (b) "tertiary" interventions, designed to reduce the worsening of symptoms among those who are experiencing symptoms associated with post-traumatic stress or have a diagnosis of PTSD; and (c) evidence-based treatments to facilitate recovery from mental health conditions.

128.    Monitoring, assessing, and providing preventative interventions and/or treatment to Plaintiffs and the class will significantly reduce the risk of long-term injury, disease, and economic loss that Plaintiffs and the class suffer as a result of Facebook's unlawful conduct.

129.    Plaintiffs seek medical monitoring to facilitate the screening, diagnosis, and adequate treatment of Plaintiffs and the class for psychological trauma, including to prevent or mitigate conditions such as PTSD.

<u>**THIRD CAUSE OF ACTION**</u>
**NEGLIGENCE - FACEBOOK**
**(Negligent Provision of Unsafe Equipment)**

130.    Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 98 as though fully set forth herein.

131.    An entity that hires an independent contractor to complete work is also liable to the independent contractor's employees or subcontractors if the hiring entity negligently provides unsafe equipment that contributes to a workplace injury.

132.    Facebook provided to its independent contractors the review platforms that Plaintiffs and the class were required to use to complete their work.

133.    Facebook had a duty to exercise reasonable care to furnish safe review platforms to its contractors.

134.    Facebook was aware of the psychological trauma that could be caused by viewing video, images, and/or livestreamed broadcasts of child abuse, rape, torture, bestiality, beheadings, suicide, murder, and other forms of extreme violence through its review platforms.

135.    Facebook was aware or should have been aware that its review platforms could be made safer if proper precautions were followed.

136.    Facebook nevertheless provided unsafe review tools to the contractor. The review platforms presented unmitigated traumatic content to Plaintiffs and the class.

137.    Facebook breached its duty to Plaintiffs and the class by failing to provide the necessary and adequate technological safeguards, safety and instructional materials, warnings, and other means to reduce and/or minimize the physical and psychiatric risks associated with exposure to graphic imagery through Facebook's review platform.

138.    Facebook continues to breach its duty to class members by failing to provide a reasonably safe review platform; that breach continues to elevate class members' risks of injury from psychological trauma.

139.    As a result of Facebook's tortious conduct, Plaintiffs and the class are at an increased risk of developing serious mental health injuries, including, but not limited to, PTSD.

140.    To remedy that injury, Plaintiffs and the class need medical monitoring that provides specialized screening, assessment, and treatment not generally given to the public at large.

141.    The medical monitoring regime includes, but is not limited to, baseline screening, assessments, and diagnostic examinations that will assist in diagnosing the adverse health effects associated with exposure to trauma. This screening and assessment will also inform which behavioral and/or pharmaceutical interventions are best suited to prevent or mitigate various adverse consequences of post-traumatic stress and other conditions associated with exposure to graphic imagery.

142.    In particular, the medical monitoring regime includes (a) "secondary" preventative interventions, designed to reduce the risk of later onset of PTSD among class members who are not yet displaying symptoms of PTSD; (b) "tertiary" interventions, designed to reduce the worsening of symptoms among those who are experiencing symptoms associated with post-traumatic stress or have a diagnosis of PTSD; and (c) evidence-based treatments to facilitate recovery from mental health conditions.

143.    Monitoring, assessing, and providing preventative interventions and/or treatment to Plaintiffs and the class will significantly reduce the risk of long-term injury, disease, and economic loss that Plaintiffs and the class suffer as a result of Facebook's unlawful conduct.

144.    Plaintiffs seek medical monitoring to facilitate the screening, diagnosis, and adequate treatment of Plaintiffs and the class for psychological trauma, including to prevent or mitigate conditions such as PTSD.

## THIRD CAUSE OF ACTION
## FDUTPA – BOTH DEFENDANTS

145.    Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 98 as though fully set forth herein.

146.    Section 501.204(1) of the Florida Statutes provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." The provisions of the Act shall be "construed liberally to promote the protection" of the "consuming public and legitimate business enterprises from those who engage in … deceptive[] or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202.

147.    Defendants were, at all times material to the allegations herein, engaged in "trade or commerce" as defined by the Section 501.203.

148.    Plaintiffs are "persons" within the meaning of Fla. Stat. § 501.211.

149.    Defendants engaged in unfair or deceptive acts or practices in the conduct of their trade or commerce by:

(1)    Knowingly exposing Plaintiffs and the class to highly toxic, unsafe, and injurious content while providing content moderation services for Facebook;

(2)    Concealing the known danger to Plaintiffs and the class, of which Defendants were aware based upon prior similar injuries to other workers as well as explicit warnings by industry groups specifically identifying the danger or exposing employees to highly toxic, unsafe, and injurious content while providing content moderation services that was virtually certain to cause injury to Plaintiffs and the class;

29

(3)     Refusing, despite the known risks, to implement proper precautions to protect Plaintiffs and the class from the known dangers of being exposed to highly toxic, unsafe, and injurious content while providing content moderation services;

(4)     Preventing Plaintiffs and the class from becoming aware of the scope of the danger caused by providing content moderation services for Facebook by, *inter alia*, forcing Plaintiffs and the class to sign broad NDAs and preventing them from discussing the dangers with new employees or other persons;

(5)     By deliberately concealing and misrepresenting these dangers to Plaintiffs and the class by, *inter alia*, falsely advertising the job as a prestigious career in high technology that simply required them to become knowledgeable about "leading social media products and community standards," to "assist our community and help resolve inquiries empathetically, accurately and on time," and to "make well balanced decisions and personally driven to be an effective advocate for our community"; and

(6)     Shutting down Cognizant's Tampa office in February 2020, laying off its workforce and leaving content moderators, including Plaintiffs and the class, with no means of obtaining requisite ongoing medical monitoring, screening, diagnosis, or adequate treatment after suffering psychological trauma during their employment.

150.    Defendants' unfair or deceptive acts or practices caused the injury of the Plaintiffs and the class, including PTSD and other psychological disorders, physical injuries including stroke

and epilepsy, and other injuries, including lost pay, lost future earning capacity, emotional distress and loss of enjoyment of life.

151.    Defendants knew or should have known that their conduct was unfair or deceptive.

152.    Defendants willfully used the aforestated unfair or deceptive acts or practices to victimize persons with disabilities, including PTSD and other psychological disorders, and therefore are liable for a civil penalty of not more than $15,000 for each such violation pursuant to Fla. Stat. § 501.2077.

153.    Pursuant to Fla. Stat. § 501.211, Plaintiffs and the class are entitled to the following relief: (1) a declaratory judgment that Defendants' actions constitute unfair or deceptive acts or practices; (2) an order enjoining Defendants from continuing to violate the law; (3) actual damages; (4) attorney's fees and court costs as provided in Fla. Stat. § 501.2105.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the class, requests that the Court:

a.    Certify this action as a class action, with a class as defined above;

b.    Find that Plaintiffs are proper representatives of the class, and appoint the undersigned as class counsel;

c.    Order Defendants to pay for notifying class members of the pendency of this suit;

d.    Order Defendants to create a medical monitoring fund for the benefit of Plaintiffs and the class;

e.    Award declaratory and injunctive relief as is necessary to protect the interests of Plaintiffs and class members, including by enjoining Defendants from continuing to conduct business through the unlawful and unfair practices alleged herein, ordering Defendants to implement safety guidelines for all prospective content

moderation operations in Florida and Arizona, and ordering Defendants to establish a fund to pay for a medical monitoring program, to facilitate the ongoing screening, diagnosis, and adequate treatment of Plaintiffs and the class for psychological trauma including to prevent or mitigate conditions such as PTSD – until it can be determined that psychological trauma is no longer a threat to their health;

f.      Award Plaintiffs and class members actual and compensatory damages, including but not limited to lost pay, medical expenses, lost future earning capacity, emotional distress and loss of enjoyment of life;

g.      Award Plaintiffs and class members their reasonable litigation expenses and attorneys' fees pursuant to applicable law, including but not limited to Fla. Stat. § 501.2105; and

h.      Award any further relief that the Court deems just and equitable.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiffs hereby request trial by jury.

Respectfully submitted,

*/s/ Jay P. Lechner*
**LECHNER LAW**
Jay P. Lechner, Esq.
Florida Bar No.: 0504351
Jay P. Lechner, P.A.
Fifth Third Center
201 E. Kennedy Blvd., Suite 412
Tampa, Florida 33602
Telephone: (813) 842-7071
jplechn@jaylechner.com
shelley@jaylechner.com
*Attorneys for Plaintiff*

32

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 6th day of March, 2020, I electronically filed the foregoing with the Clerk of the Court by using the Florida Courts E-Filing Portal, and that a true and correct copy of the foregoing was served by email to all counsel of record.

/s/ Jay P. Lechner<br>
Attorney